## Guthrie's Appeal.

16　　　321
20 SC　299

Under the act of 13th June 1836, relative to lunatics, when the Court of Common Pleas has decreed an allowance out of the proceeds of sale of the real estate of a lunatic, for his maintenance, the amount is not to be exceeded without the sanction of the court. The estate of a lunatic is subject to the control of that court.

THIS was an appeal by George Guthrie, administrator of the estate of William Guthrie, deceased, from the decree of the Orphans' Court of Centre county, on his administration account.

In 1832, William Guthrie was found to be a lunatic, under proceedings had in the Court of Common Pleas of Centre county, and John Potter and William Iddings were appointed his committee. In pursuance of an order of said court, made 28th January 1837, his real estate was ordered to be sold. George Guthrie, the eldest son, and only one not then in his minority, purchased the land, and on his petition and that of his mother and the other children, the court changed the terms of the sale, and, by a special decree, directed that $2000 should be secured by bond and mortgage on the premises, "conditioned for the payment of all the interest yearly, and so much of the principal as the court may from time to time order and direct, to the maintenance and support of said lunatic, and upon the decease or restoration of said lunatic, then the residue of said money to be paid to such person or persons as by the laws of this commonwealth are legally entitled thereto, under the decree of this court." The hand-money paid and satisfied the debts

of the lunatic, and the mortgage was executed in accordance with the decree.

On the 30th November 1837, the committee having settled their account, John Potter was discharged; the purchaser went into possession of the real restate, and his father went to reside with him, and there continued until his death, on the 14th December 1844.

In 1845, George Guthrie, the purchaser of the estate and mortgagor, took out letters of administration, and in his administration account charged the sum of $200 a year for the maintenance of his father. The administrator kept no account against his father; he had no vouchers for any expenses incurred, nor any charges in his books of account. No contract was ever made by the committee with George Guthrie for the maintenance of the lunatic; nor was there ever any application made to the court for any additional allowance for his maintenance.

The account was referred to auditors. The third exception to the administration account was—The annual interest on the mortgage was more than a sufficient allowance for the keeping of William Guthrie, and the administrator should be charged with that excess, and interest thereon.

The auditors reported as to this exception, viz. "The evidence on this subject is somewhat contradictory, but the weight of the testimony goes to prove that the charge is not an unreasonable one, considering all the circumstances, and we therefore feel bound to say that this part of the objection is not sustained. We must not estimate the expense and trouble as we would that of supporting a person in the full exercise of his reason, but we are to take into view the trouble and expense which arise purely from the irregularity of his conduct. Secondly, on this point it was argued that he is entitled to no more annually than the interest accruing on the mortgage, inasmuch as that was all that the committee were allowed to expend for that purpose, until the court so ordered; and as the power of the committee terminated at the death of the lunatic, no further decree can be made in the premises by the Common Pleas. This objection requires us to dispose of another point which was not raised on the argument. Is the accountant required to pursue the committee of the lunatic for satisfaction of his demand, or, were he not the administrator, could he recover the amount from his personal representative? It appears from the evidence that no contract existed between the committee and George Guthrie, relative to maintenance. Mr. Iddings, on the contrary, swears that "he rather considered that he was clear of him when the account was filed." If an express contract were made with the committee, or a contract arose from necessary implication, no doubt the law would drive him to seek his remedy from them. But, on the contrary, it would seem that no dealing

[Guthrie's Appeal.]

was had on that account between the committee and George, and he was left to be taken care of by George, without any understanding on the subject, and Mr. Iddings never took any notice of his trust from the settlement of the account, in 1837, down to the time of the lunatic's death. It is clear, that if the lunatic was not in the hands of a committee, a person furnishing him with necessaries may recover the amount from him after his mind has been restored, or from his administrator after his death; and when the committee, in case there be one, perform their duties and supply his wants, a person furnishing even necessaries to the lunatic could not recover the amount thereof. But the law is otherwise when the committee neglect to provide for their charge; and such appears to be the case. This point is decided in the case of Call v. Ward, 4 W. & Ser. 118, where the question arose in reference to another relation, which we look upon as analogous in this respect. The contract being with the lunatic, and not with the committee, the amount to be allowed is not limited by the decree of the Common Pleas, as it might be in case it was necessary to resort to the committee for compensation. If the lunatic had recovered his reason, then, under the decision above referred to, an action of *indebitatus assumpsit* could be maintained against him, and, of course, it would lie against his personal representative after his death. We think, therefore, that the amount of the compensation is in no way affected by the action of the Common Pleas, and must depend upon the evidence in the case.

Exceptions were filed by the heirs of William Guthrie to the report of the auditors, and on the 9th of February, 1849, the Orphans' Court awarded an issue to be certified to the Common Pleas, to settle the amount of compensation to which the accountant would be entitled. Upon the trial of the feigned issue, certain questions of law were raised, which were *reserved* by the court for their determination after the verdict should be rendered. The jury found for the accountant the full amount claimed by him for the maintainance of his father, viz. $1966.49, but the court, after argument, directed the clerk to restate the account, allowing the accountant annually the interest on the mortgage given by him to the committee of the lunatic, being $120 per annum. This was accordingly done. From the decree of the Orphans' Court the accountant appealed.

The opinion of WOODWARD, J., in part, was as follows:—

From the time that a man is decreed a lunatic, according to our act of Assembly, his estate is placed in *custodia legis*. His committee are the agents of the law to manage it and apply the "income." If the income be found inadequate to pay his debts, and to support the lunatic and his family, his personal estate may, under direction of the court, be applied to these purposes; and if this fail, necessary portions of the real estate may be mortgaged or

sold, as the court in its discretion, after inquiries and audits, shall decree. * * *.

I speak not of imaginable cases, where, after refusal by the committee to provide, and before application could be made to the court, humanity affords temporary relief, nor of circumstances of sudden and extreme emergencies. In these and similar conditions I would be willing to admit that the law would subject the estate to a *quantum meruit* compensation of the benefactor. But when the court has taken orders for his support, sold his real estate, secured the price by mortgage, and devoted the interest to his support, and has not dissolved the commission, nor been asked to discharge the committee, but is maintaining the system that the legislature has provided, I deny that any man, whether a son or a stranger, can, for a period of years, take more of his estate, according to his discretion, or judgment of his neighbor, and apply it to the support and maintenance of the lunatic. That estate, and the owner of it, have been segregated from the community and placed with the court, under a system of rules and regulations, and whoever would touch it, must approach it according to that system.

Although there was no arrangement between the plaintiff and Mr. Iddings, the continuing committee man, that the plaintiff should take his father, and keep down the interest on the mortgage, which he had undertaken to pay, that, nevertheless, would have been a "very convenient and suitable disposition to be made of" the lunatic. And when Mr. Iddings saw the plaintiff taking and keeping him, and withholding the annual interest on the mortgage, it is not strange that he should have let it alone, as the best arrangement for all the parties that could be made. But if Mr. Guthrie found that $120 a year was not compensating him, he was bound to remember, what he very well knew, that the estate of his father was in the keeping of the court, and that until the conscience of the court was further informed, $120 a year was the appointed compensation for keeping him.

He never applied to the court, either to remove the committee or enlarge the allowance, but now, after the father is dead, he asks that the heirs should allow him to take out of the estate $80 a year more than the court had adjudged to be necessary.

That he deserved this extra allowance we are bound to presume, seeing that the auditors and a jury have pronounced in his favor; but he cannot have it, because the law interposes an insuperable obstacle. It is a rule, founded in an express statute, (see act of 1806, not referred to in the argument,) that where a remedy is provided, or a duty enjoined, or a thing directed to be done, by an act of Assembly, "the directions of said act shall be strictly pursued, and no penalty shall be inflicted or any thing done agreeably to the provisions of the common law in such cases, further than shall

[Guthrie's Appeal.]

be necessary for carrying such act or acts into effect." See *Dunlop's Dig.* 243, and 1 *Pa. Rep.* 283.

The fact that the question is raised after the death of the lunatic, cannot change the principle on which it is to be decided. The protection given to the estate extended throughout his life, and although his death dissolved the commission and all proceedings under it, we cannot go back and treat it as an unprotected estate, and order it to purposes *now* which it could not have been made to answer in his lifetime. The rights of the heirs were among the objects of protection contemplated by the act of Assembly. On the whole, I am of opinion that the plaintiff should have credit in his administration account, not for the amount claimed by him, nor for the amount of the verdict, but for the amount of the accruing interest on the mortgage.

*Curtin* and *Linn*, for appellant.—The plaintiff in error took the lunatic to his house and maintained him comfortably till his death. His *death* discharged his committee, and all his estate passed from the control of the Common Pleas to the Orphans' Court. The charge for his support and maintenance became a debt against his estate, letters of administration were granted to plaintiff, the jurisdiction of the Orphans' Court attached, and the act of 13th June 1836 ceased to control or affect the estate of the lunatic.

The committee could at any time during the life of the lunatic, when the income from his estate became inadequate to his support, have applied to the Common Pleas for power to raise more money. If they had advanced their own money, they could have been reimbursed in the same way. They did not, and the administrator is now in court, asking that to be done which ought to have been done, and in a court which has exclusive jurisdiction of the estate, independent of the act of 13th June 1836.

As to the reasonable character of the claim, reference was made to the administration account passed and allowed by the register, the report of the auditors on exceptions filed to it, and the verdict of the jury allowing to the plaintiff the amount claimed: 11 *Pickering* 304, cited.

*Burnside*, with whom was *McAllister*, for appellee.—The act of 13th June 1836, relative to lunatics, is a regular system in itself; all the details of the proceedings are minutely set forth; the manner in which the jurisdiction shall be exercised; the form of the commission; upon whose application it shall be issued; the number of jurors; the pay of the commissioner, in short all the provisions of the act constitute the Court of Common Pleas the guardian of lunatics, as fully as is the crown in Great Britain.

It is the duty of the committee (20th section) to apply the income of the real and personal estate to the support of the lunatic.

2C

[Guthrie's Appeal.]

If that is not sufficient, (section 21,) it is lawful for the committee, "*under the directions of the court*, to apply so much of the personal estate as shall be necessary," &c. Should this also prove insufficient, the succeeding sections provide how his maintenance may be supplied from the real estate.

The committee (section 43) are entirely under the order and control of the court.

William Guthrie and his estate were in *custodia legis*. The court had ordered that two thousand dollars should be secured by bond and mortgage on the premises, "conditioned for the payment of all the interest yearly, and so much of the principal as the court may from time to time order and direct, to the maintenance and support of said lunatic;" and no more than that interest could be taken for the support of the lunatic, by the committee, or any one else, without obtaining, in accordance with the act, the sanction of the court. This was never asked during the lifetime of the lunatic.

The opinion of the court was delivered June 16, by

BELL, J.—The conclusion arrived at by the court below is obviously a just deduction from the evidence given and the law applicable to the facts proved. The reasons given by the judge who pronounced the decision are so far satisfactory that I deem it unnecessary to add any thing to his argument, save a reference to Eckstein's case, 2 *Pa. Law Jour.* 138, approved by this court in Wright's Appeal, 8 *Barr* 57, both of which harmonize with and enforce the general view taken below of the extent of protection to which the person and estate of a lunatic are entitled.

Were it necessary to support the decree, I think it might be assumed the law would, from the circumstances proved, imply a tacit agreement on the part of the appellant to keep and maintain his father for the yearly sum assigned by the court for that purpose. Indeed I cannot well see how such a presumption is to be evaded, if any regard be due to probabilities.

Decree affirmed.